# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DAVID SPRADLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 15-CV-340-JHP** |
| | ) | |
| **THE LEFLORE COUNTY** | ) | |
| **DETENTION CENTER PUBLIC** | ) | |
| **TRUST BOARD and** | ) | |
| **ED DRURY, in his individual** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION & ORDER

Before the Court are the (1) Motion for Summary Judgment filed by
Defendant Ed Drury (Dkt. 107) and (2) Motion for Summary Judgment filed by
Defendant Leflore County Detention Center Public Trust Board (Dkt. 105). In the
interest of efficiency, the Court will address both Motions in this Opinion and
Order. After consideration of the briefs, and for the reasons stated below, both
Motions are **GRANTED**.

## BACKGROUND

Plaintiff David Spradley ("Plaintiff") is a paraplegic with use of his upper
body, including his hands, arms, shoulders, neck, and head. (Dkt. 107, at 3

(Drury's Undisputed Fact Nos. 1-2)).[1]  Plaintiff has no use of his legs or control of his bladder or bowel.  (Dkt. 107-4 (DOC Letter)).  Because of his paralysis, Plaintiff is prone to bedsores (also known as decubitus ulcers or pressure sores), and he requires special accommodations to lessen the probability of bedsores, including a cushioned wheelchair and a gel-filled mattress for his bed.  (*Id.*).  Plaintiff has repeatedly suffered from bedsores necessitating treatment since his spinal injury occurred in 2011, through the date of his 2014 incarceration at the Leflore County Detention Center ("LCDC").  (Dkts. 107-7 to 107-21 (Medical Records for Plaintiff)).  It is undisputed that paraplegics such as Plaintiff can develop bedsores, and such bedsores can worsen, even with good care and absent negligence.  (Dkt. 107, at 12 (Drury's Undisputed Fact No. 44)).

On September 2, 2014, Plaintiff was arrested and booked into LCDC pursuant to an application to revoke his suspended sentence.  (Dkt. 107-28 (Application to Revoke Suspended Sentence)).  He was booked into LCDC and bonded out the next day. (Dkt. 107-29, at 2 (LCDC Jail Time Statement)).  On September 4, 2014, Plaintiff was re-arrested and re-booked into LCDC.  (*Id.*).

---

[1] In the Background section of this Opinion and Order, the Court refers primarily to the evidence presented in Ed Drury's Motion for Summary Judgment (Dkt. 107).  However, the Leflore County Detention Center Public Trust Board presents largely the same evidence in support of its own Motion for Summary Judgment (Dkt. 105).  Therefore, the evidence cited in this section is relevant to both Motions.

Plaintiff remained in LCDC custody for eighteen days, until September 22, 2014. (Dkt. 107, at 6 (Drury's Undisputed Fact No. 12)).

Plaintiff was allowed to bring his own special gel mattress topper and wheelchair to LCDC. (Dkt. 107, at 6 (Drury's Undisputed Fact No. 13)). Plaintiff's father later provided a shower chair, which Plaintiff was allowed to use to shower at LCDC. (Dkt. 107-31 (Drury Deposition), 64:8-24). Following Plaintiff's second booking on September 4, 2014, Defendant Nurse Ed Drury ("Drury") performed Plaintiff's initial medical screening. (Dkt. 107-31 (Drury Deposition), 36:7-39:8). Drury noted a pressure sore on Plaintiff's right foot and a sore that was healing on Plaintiff's left foot. (*Id.* at 37:15-38:7). Drury also observed a red mark on Plaintiff's left hip. (*Id.* at 42:12-25).

Drury then called Nurse Practitioner Tim Olive ("Olive") to come to the jail to examine Plaintiff. (*Id.* at 39:9-40:2). Olive assessed Plaintiff on the evening of September 4, 2014, noted the pressure sore on Plaintiff's right foot and other medical issues, and recommended that Plaintiff be seen at Eastern Oklahoma Medical Center ("EOMC"). (*Id.* at 40:3-42:3; Dkt. 107-32 (Olive Deposition), 20:9-23:16). Olive further recommended use of wet-to-dry dressings on the right foot sore, to be changed twice a day, and he recommended Plaintiff wear compression hose to reduce swelling. (Dkt. 107-31 (Drury Deposition), 41:4-18;

3

43:2-4; Dkt. 107, at 7 (Drury's Undisputed Fact No. 20)). Plaintiff declined Olive's recommendation to go to EOMC that night, because Plaintiff planned to be released from jail shortly thereafter. (Dkt. 107-31 (Drury Deposition), 40:23-41:3). Plaintiff also refused to wear the compression hose. (Dkt. 120-2 (Olive Deposition), 24:8-12).

On September 6, 2014, Plaintiff went to EOMC for the assessment Olive had ordered on September 4th. (Dkt. 107-31 (Drury Deposition), 48:4-24, 51:16-20; Dkt. 107-6 (Dr. Stone Deposition), 129:10-19). At EOMC, Dr. Jeff Spears provided wound care to Plaintiff and prescribed heel protectors before discharging Plaintiff that same day. (Dkt. 107, at 8 (Drury's Undisputed Fact No. 24)). No bedsores were present on Plaintiff's buttocks or hips on September 6, 2014. (*Id.*).

Following Plaintiff's return to LCDC, Drury performed wound care for Plaintiff, applying wet-to-dry dressings twice a day. (Dkt. 107-31 (Drury Deposition), 43:1-24; (Dkt. 107-1 (Plaintiff Deposition), 346:16-20, 359:8-16, 362:13-18, 368:15-18, 375:20-22).[2] Plaintiff refused to wear the prescribed heel protectors. (Dkt. 107-31 (Drury Deposition), 51:3-15). Drury assisted Plaintiff

_____

[2] Plaintiff stated in his deposition that on the week of September 14-20, Drury did not change his bandages every day, but he did change them on some days. (*See* Dkt. 107-1 (Plaintiff Deposition), 377:16-21). Accordingly, even if there remains some dispute regarding the frequency with which Drury attended to Plaintiff's dressings, it is undisputed that Drury provided regular wound care.

4

with his bowel program and catheter when Drury was at the jail. (Dkt. 107-31 (Drury Deposition), 104:9-25; Dkt. 107-1 (Plaintiff Deposition), 375:12-19). Drury also administered medications to Plaintiff, although Plaintiff disputes that it was administered in the prescribed doses. (Dkt. 107-1 (Plaintiff Deposition), 335:2-336:3, 476:8-11). Plaintiff also received assistance from Drury or other LCDC guards in changing position at least twice per day. (Dkt. 120-4 (Plaintiff Deposition), 537:22-538:19). Jail Administrator Donnie Edwards walked by Plaintiff's jail cell every day he was on duty to check on him, and Plaintiff never complained he was being mistreated by Drury or other LCDC staff. (Dkt. 107, at 9 (Drury's Undisputed Fact No. 31)). Dr. Jeffrey Stone, Plaintiff's wound care expert, has no criticism of the treatment Drury provided for Plaintiff's wounds between September 7 and September 16, 2014. (Dkt. 107-6 (Dr. Stone Deposition), 135:16-24).[3]

---

[3] Plaintiff testified in his deposition that he and Drury both observed wounds opening on his hips and buttocks on September 8th. (Dkt. 120-3 (Plaintiff Deposition), 362:1-12; Dkt. 120-4 (Plaintiff Deposition), 553:1-23). However, this testimony is plainly contradicted by Drury's contemporaneous typewritten notes, upon which Plaintiff relies. (*See* Dkt. 120-6 (Drury's Notes)) (indicating no hip wounds present as of September 10th). Therefore, the Court finds no genuine issue of material fact exists based on this testimony. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Plaintiff received at least three or four showers at the jail during his stay. (Dkt. 112-1 (Plaintiff Deposition), 543:12-14). To shower, Plaintiff undressed in his cell and was wheeled through the booking area to reach the shower area. Drury testified that Plaintiff was always covered with a blanket when he was wheeled to the shower room. Dkt. 105-3 (Drury Deposition), 109:4-20). However, Plaintiff testified that the first time he showered at LCDC, he was wheeled naked through the booking area, in view of other inmates and several laughing jail employees. (Dkt. 112-1 (Plaintiff Deposition), 544:21-547:13).

On September 16, 2014, Drury noted a closed reddened area on Plaintiff's left hip, including an area of necrotic tissue, for which Drury ordered wet-to-dry dressing changes. (Dkt. 120-6 (Drury's notes, dated Sept. 16, 2014)).[4] Dr. Stone testified that this kind of wound would not have required a physician's examination, and the standard of care was appropriate on September 16th. (Dkt. 107-6 (Dr. Stone Deposition), 137:10-22). On September 17, 2014, the closed reddened area on the hip was unchanged, measuring two centimeters by two

_____

[4] In his Response to Drury's Motion, Plaintiff insists that Drury's typewritten notes from the 16th indicate drainage was present at the hip wound. (*See* Dkt. 120 (Plaintiff's Response), at 16-17). However, Drury's typed notes from the 16th indicate only "serous sangeous [sic] drainage noted" on Plaintiff's right heel and right ankle, and the left hip wound was noted as a "closed area" with "dark looking necrotoc [sic] area to center of wound, closed." (Dkt. 120-6 (Drury's Notes)).

centimeters.  (Dkt. 120-8, at 7 (Nurse's Notes, dated Sept. 17, 2014); Dkt. 107-6 (Dr. Stone Deposition), 138:9-17).  On September 18, 2014, Drury noted the reddened area on the hip was the same size but was leaking a small amount of serosanguinous drainage.  (Dkt. 120-8, at 7 (Nurse's Notes, dated Sept. 18, 2014)).  Dr. Stone testified this wound, while not requiring a physician's examination, would have caused him concern that Plaintiff was "heading down the path of breaking down," given Plaintiff's medical history.  (Dkt. 107-6 (Dr. Stone Deposition), 141:12-23; 143:4-6).

On September 19, 2014, Drury noted a reddened area on Plaintiff's buttocks, and he noted no new deterioration of the hip area.  (Dkt. 120-8, at 7 (Nurse's Notes, dated Sept. 19, 2014)).  Dr. Stone testified that these wounds, while not requiring a physician's examination or hospital care, would have warranted checking on Plaintiff's wounds "significantly more often." (Dkt. 107-6 (Dr. Stone Deposition), 144:16-22).  Dr. Stone further testified that on the 18th and 19th, Drury would have had to make a judgment call about how to treat the reddened areas.  (*Id.* at 145:20-23).  In addition, Dr. Stone testified that there is room for a reasonable difference of opinion concerning Drury's actions in regard to his treatment of Plaintiff's sores.  (*Id.* at 43:1-7).

Drury was not on duty on Saturday, September 20, 2014, or Sunday, September 21, 2014, and he did not go to the jail that weekend. (Dkt. 107, at 11 (Drury's Undisputed Fact No. 42)). Drury instructed Detention Officer James Lowe ("Lowe") on how to change Plaintiff's wound dressings while Drury was not on duty, and Lowe helped change the dressings when Drury was not on duty. (Dkt. 107-33 (Lowe Deposition), 18:9-24, 21:17-19; Dkt. 107-31 (Drury Deposition), 79:15-24; Dkt. 105, at 4 (Board's Undisputed Fact No. 13)).[5] Plaintiff did not complain to Lowe about his bedsores or the medical treatment he was receiving at the jail. (Dkt. 107, at 10 (Drury's Undisputed Fact No. 33)). However, Plaintiff testified that on September 20th, he defecated on himself and remained in his soiled clothing until Drury returned on September 22nd, because the jailers refused to assist him with his bowel program or provide him with clean clothes. (Dkt. 112-1 (Plaintiff Deposition), 558:10-560:17).

When Drury returned to work on September 22, 2014, he observed that the wounds on Plaintiff's hips and buttocks had worsened and opened. (Dkt. 120-8, at 8 (Nurse's Notes, dated Sept. 22, 2014); Dkt. 107-31 (Drury Deposition), 82:2-11).

_____

[5] In his Response to the Board's Motion for Summary Judgment, Plaintiff admits that Lowe helped change Plaintiff's dressings when Drury was not on duty. (Dkt. 112, at 6). Conversely, in his Response to Drury's Motion for Summary Judgment, Plaintiff denies the same fact. Because Lowe's actions in caring for Plaintiff's needs pertain only to the Board's Motion, the Court will deem this fact admitted.

Plaintiff was transported to EOMC that day for treatment. Dkt. 107-31 (Drury Deposition), at 84:18-21). Later that day, Plaintiff was transferred from EOMC to Hillcrest Hospital in Tulsa, Oklahoma, where he received anesthesia and surgical debridement of the necrotic tissue. (Dkt. 120-4 (Plaintiff Deposition), 561:19-562:25).

Following the initiation of this lawsuit, Drury was terminated from his employment with LCDC for falsifying medical records as they pertained to Plaintiff. (Dkt. 120-7 (Donnie Edwards Deposition), 44:20-46:21). Specifically, Drury's notes pertaining to Plaintiff described treatment on dates after Plaintiff had already been transported to EOMC. (*See* Dkt. 120-8 (Nurse's Notes), at 8-9) (noting treatment of Plaintiff on Sept. 23-25, 2014).

Plaintiff filed a Complaint in this case on September 8, 2015. (Dkt. 3). In the Complaint, Plaintiff asserts claims for (1) relief under 42 U.S.C. § 1983 against Drury and the Leflore County Detention Center Public Trust Board ("Board) for failure to provide medical treatment in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution; (2) relief under 42 U.S.C. § 1983 against the Board for negligent training and supervision related to Plaintiff's serious medical needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution; (3) relief under 42

U.S.C. § 1983 against the Board for having a policy or engaging in a pattern and practice of conduct that led to the violation of Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution; (4) relief pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 against the Board for denial of the disabled Plaintiff's ability to shower consistently, receive proper toilet facilities, and obtain proper medical treatment; and (5) relief under the Rehabilitation Act, 29 U.S.C. § 794, for discrimination Plaintiff suffered based on his disability.  (Dkt. 3, ¶¶ 27-49).[6]

Drury has now filed a Motion for Summary Judgment on Plaintiff's claim against him.  (Dkt. 107).  Plaintiff filed a Response in opposition (Dkt. 120), and Drury filed a Reply (Dkt. 130).  The Board has also filed a Motion for Summary Judgment on Plaintiff's claims against it.  (Dkt. 105).  Plaintiff filed a Response in opposition (Dkt. 112), and The Board filed a Reply (Dkt. 119).  The Motions are fully briefed and ripe for review.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[6] Plaintiff also sued Defendant Donnie Edwards, Jail Administrator for the Board, in his official capacity.  However, Edwards was dismissed from this case on October 12, 2016.  (Dkt. 99).

R. Civ. P. 56(a).  A dispute is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

However, a party opposing a motion for summary judgment may not simply allege there are disputed issues of fact; rather, the party must support its assertions by citing to the record or by showing the moving party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c).  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994) ("Even though all doubts must be resolved in [the nonmovant's] favor, allegations alone will not defeat summary judgment.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Moreover, "[i]n a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."  *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (citations omitted).  Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## I.      Motion of Drury

In his Motion for Summary Judgment, Drury argues Plaintiff fails to establish a constitutional violation against him for denial of medical care. Drury further argues he is entitled to qualified immunity and Plaintiff may not recover punitive damages from him. In his Response, Plaintiff argues he suffered a constitutional deprivation because medical treatment was delayed. As a result of this delayed treatment, Drury is not entitled to qualified immunity and Plaintiff is entitled to punitive damages.

### A.      Eighth Amendment Violation – Denial of Medical Care

#### 1.      Standard of Review

42 U.S.C. § 1983 provides a claim for relief against state actors for violation of a plaintiff's constitutional rights. *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007). Under the Eighth Amendment, prisoners have a constitutional right to medical care, which is violated when doctors or prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97,

103-04 (1976).[7]  The Tenth Circuit recognizes two types of conduct amounting to deliberate indifference in the context of prisoner medical care.  "First, a medical professional may fail to treat a serious medical condition properly."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  When this type of conduct is alleged, "the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent."  *Id.* (citing *Estelle*, 429 U.S. at 105-06).  Second, prison officials may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment."  *Id.* (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).  A prison medical professional who serves solely "as a gatekeeper for other medical personnel capable of treating the condition" may be liable under this standard if he or she "delays or refuses to fulfill that gatekeeper role due to deliberate indifference."  *Id.*

---

[7] Although Plaintiff seeks relief pursuant to the "Fourteenth and/or Eighth Amendment" (*see* Dkt. 3), his claims for deliberate indifference in providing medical treatment are properly addressed under the Eighth Amendment, because he was a convicted inmate.  Pretrial detainees are protected under the Fourteenth Amendment's due process clause while convicted inmates are protected by the Eighth Amendment.  *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 307 (10th Cir. 1985).  When Plaintiff was booked into the LCDC on September 4, 2014, he had been arrested on a revocation of a suspended sentence.  Accordingly, Plaintiff was not a pretrial detainee, as he had already been convicted of a crime.

Deliberate indifference "involves both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Sealock*, 218 F.3d at 1209). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999)). The question raised by the objective prong "is whether the alleged harm . . . is sufficiently serious . . . , rather than whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Mata*, 427 F.3d at 751 (quoting *Farmer,* 511 U.S. at 837). The subjective component may be satisfied if the jury can "infer that a prison official had actual

14

knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 842).

Moreover, the subjective component may be satisfied if the defendant's "delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. However, the "'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

### 2. Objective Inquiry – Serious Medical Condition

Here, Plaintiff cannot satisfy the objective component required to prove Drury committed an Eighth Amendment violation. Plaintiff's allegations that a constitutional violation occurred focus on the bedsores that developed on his hips and buttocks while at LCDC. Prior to September 16, 2014, Plaintiff had no noticeable bedsores on his hips or buttocks that required treatment. (*See* Dkt. 107-6 (Dr. Stone Deposition), 135:7-10, 136:20-137:2). When the closed, reddened sore appeared on Plaintiff's hip on September 16, 2014, the condition did not warrant sending Plaintiff to the hospital or even calling a doctor, according to

15

Plaintiff's own expert, Dr. Stone. (*See id.* at 137:3-19). Nor did the hip wound or the developing wound on Plaintiff's buttocks warrant physician examination or hospital transport on September 17, 18, or 19, according to Plaintiff's expert. (*See id.* at 143:1-6, 144:16-22).

Drury was not at the jail on September 20th, or 21st, which meant he was not in a position to determine the seriousness of Plaintiff's bedsores. (Dkt. 107, at 11 (Drury's Undisputed Fact No. 42)). On September 22, 2014, the bedsores had become serious, but Drury immediately arranged for hospital transport for Plaintiff upon examination of those wounds.[8] Dkt. 107-31 (Drury Deposition), at 84:18-21). At no point when Drury was on duty prior to September 22 did Plaintiff's wounds obviously require a doctor's attention. As a result, Plaintiff has failed to satisfy the objective component by establishing his hip and buttocks sores were sufficiently serious to require a physician's care between September 4 and September 19, 2014.

---

[8] Plaintiff disputes whether Drury contacted Olive after observing Plaintiff's bedsores on September 22, 2014, pointing to Olive's testimony contradicting Drury's testimony to that effect. (*See* Dkt. 120-2 (Olive Deposition), 29:10-20, 32:19-33:1). Plaintiff further disputes whether Olive ordered Plaintiff's transfer to EOMC. However, it is undisputed that Plaintiff went to EOMC on September 22, 2014, immediately after Drury's examination of Plaintiff's wounds. Therefore, it is immaterial for purposes of Drury's Motion whether Olive or someone else actually ordered the transfer to EOMC.

### 3.    Subjective Inquiry – Intentional Disregard of Substantial Risk of Harm

Even if Plaintiff could establish his injuries were sufficiently serious prior to September 22nd, Plaintiff fails to satisfy the subjective component of the deliberate indifference test.  Drury submits ample evidence that he cared for Plaintiff's medical issues and treated Plaintiff's bedsores in a manner he thought appropriate, using his judgment as a medical professional.  Plaintiff may have disagreed with Drury's treatment of his bedsores, but he provides no evidence that Drury failed to treat him or ignored his serious medical issues.  *See Ramos*, 639 F.2d at 575 ("a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.").

The evidence shows that, shortly after his booking on September 4, 2014, Drury contacted Olive to evaluate the pressure sore on Plaintiff's heel.  (Dkt. 107-31 (Drury Deposition), 39:9-40:2).  At that time, Olive recommended Plaintiff transfer to EOMC for evaluation, but Plaintiff refused.  (Dkt. 107-31 (Drury Deposition), 40:23-41:3).  Plaintiff also refused to wear his prescribed compression hose to reduce his swelling.  (Dkt. 120-2 (Olive Deposition), 24:8-12).  Plaintiff eventually agreed to go to EOMC for evaluation on September 6, 2014.  (Dkt. 107-

31 (Drury Deposition), 48:4-24, 51:16-20).  Following Plaintiff's return to the jail, Drury remained attentive to Plaintiff's bedsores and was monitoring them daily. (*See* Dkt. 107-31 (Drury Deposition), 43:1-24; Dkt. 107-1 (Plaintiff Deposition), 346:16-20, 359:8-16, 362:13-18, 368:15-18, 375:20-22).  At the jail, Plaintiff refused to wear the heel protectors EOMC prescribed to prevent pressure sores. (Dkt. 107-31 (Drury Deposition), 51:3-15).

In addition to regularly changing the dressings on Plaintiff's foot and ankle sores, Drury made sure Plaintiff was turned, administered Plaintiff's medications, and assisted Plaintiff with his bowel program and catheter procedure.  (Dkt. 107-31 (Drury Deposition), 104:9-25; Dkt. 107-1 (Plaintiff Deposition), 335:2-336:3, 375:12-19, 476:8-11, 537:22-538:19).  Plaintiff's wound care expert has no criticism of the treatment Drury provided for Plaintiff's wounds between September 7 and September 16, 2014.  (Dkt. 107-6 (Dr. Stone Deposition), 135:16-24).

Drury monitored and applied dressings to the reddened area on Plaintiff's hip, when it appeared on September 16th.  According to Plaintiff's own wound care expert, such reddening can occur without negligence, and such sores can worsen even with appropriate treatment.  (Dkt. 107-6 (Dr. Stone Deposition), 144:7-11).  On September 16-19, that reddened area and additional reddened areas

18

did not warrant examination by a doctor or transport to the hospital. (*Id.* at 137:16-140:15, 142:1-144:22). The wounds apparently worsened over the weekend of September 20-21, when Drury was off duty and not at the jail. When Drury returned to the jail on September 22, 2014, and observed that Plaintiff's wounds had worsened, he was sent immediately to EOMC for treatment. Dkt. 107-31 (Drury Deposition), at 84:18-21).

Plaintiff's wound care expert testified to two concerns regarding Drury's treatment of Plaintiff after September 16th—that Drury should have been checking Plaintiff more frequently than he did, and Drury should have made sure Plaintiff was turned more often than he was. (Dkt. 107-6 (Dr. Stone Deposition), 138:17-25, 141:14-23, 142:14-25, 144:19-22). However, Dr. Stone also testified there could be a disagreement about how best to care for a person with Plaintiff's physical issues and injuries. (Dkt. 107-6 (Dr. Stone Deposition), 43:1-7). These concerns, while perhaps rising to the level of medical negligence, fail to establish deliberate indifference amounting to a constitutional violation. Negligence alone does not amount to a constitutional violation. *Self*, 439 F.3d at 1233. There is no evidence that Drury knew of and disregarded a substantial risk of harm to Plaintiff caused by his bedsores. No reasonably juror could conclude Drury's actions evince deliberate indifference to Plaintiff's medical needs.

### 4. Plaintiff's Additional Arguments

In his Response, Plaintiff raises two additional arguments in support of his claim that Drury acted with deliberate indifference. Each argument is addressed below.

### a) Failure to Perform Gatekeeper Role

First, Plaintiff argues an issue of fact remains regarding Drury's failure to perform his role as a gatekeeper of medical information. As explained above, a prison medical professional who serves "solely . . . as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if he "delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Sealock*, 218 F.3d at 1211. Plaintiff argues Drury's role as a gatekeeper has been established, because he was required to report Plaintiff's condition to Olive, the Nurse Practitioner at LCDC. Plaintiff asserts Drury failed to fulfill his gatekeeping role by failing to contact Olive about the "open sores" on Plaintiff's hips and buttocks on September 16th. (Dkt. 120, at 20). According to Plaintiff, Drury's failure to call Olive rises to deliberate indifference.

Plaintiff's argument is not compelling. As an initial matter, Plaintiff cites to no evidence supporting his contention that Drury was required to report any

change in Plaintiff's condition to Olive, and Drury disputes this contention. The evidence shows Drury himself was treating Plaintiff's bedsores, using his own judgment as a medical provider. Accordingly, Drury's status as a "gatekeeper" is itself questionable.

Second, Plaintiff provides no evidence to support his assertion that Drury knew Plaintiff's hip and buttocks wounds had opened by September 16th, which would have necessitated a consultation with Olive. To the contrary, Drury's typed notes from that date indicate the hip and buttocks wounds were closed and he was applying dressings to those wounds. (*See* Dkt. 120-6 (Drury's Notes)). Plaintiff's wound care expert testified that Drury would have had to make a judgment call about Plaintiff's reddened areas as late as September 19th. (Dkt. 107-6 (Dr. Stone Deposition), at 145:20-23). Accordingly, the decision as to when to call Olive was also a matter of Drury's judgment as a medical provider.

In short, there is no evidence that Drury refused to call Olive despite an obvious condition that required more extensive medical care. "[T]he subjective component is not satisfied, absent an extraordinary degree of neglect, where a [prison health official] merely exercises his considered medical judgment," which traditionally includes decisions such as "whether to consult a specialist or undertake additional medical testing." *Self*, 439 F.3d at 1232. Thus, to the extent

Drury was acting as a gatekeeper of medical information, his failure to call Olive on September 16th, 17th, 18th, or 19th did not rise to the level of deliberate indifference.

### b) Falsification of Medical Records

Second, Plaintiff argues Drury's falsification of medical records evidences deliberate indifference to Plaintiff's medical condition. It is undisputed that Drury was terminated from his position for falsifying medical records as they related to Plaintiff. Donnie Edwards, the Jail Administrator for LCDC, testified that Drury was terminated because "[h]e went back on his memory and tried to make records of everything that happened, and he got some of the dates wrong." (Dkt. 120-7 (Edwards Deposition), 45:11-13).

It is apparent that Drury's handwritten notes are at least partially inaccurate, insofar as they describe treatment of Plaintiff at LCDC occurring after September 22nd, when Plaintiff was no longer at LCDC. (*See* Dkt. 120-8 (Nurse's Notes), at 8-9) (noting treatment of Plaintiff on Sept. 23-25, 2014). Drury does not deny Plaintiff's allegation that the medical records were falsified, and he offers no explanation for the plain inaccuracies in the notes. However, Drury maintains the falsification of Plaintiff's medical records, even if true, is insufficient to prove deliberate indifference.

The Court agrees with Drury that the falsification of medical records is itself insufficient to demonstrate deliberate indifference. "A showing of deliberate refusal to provide medical attention, as opposed to a particular course of treatment, coupled with falsification of medical records may give rise to an Eighth Amendment violation and is cognizable under 42 U.S.C. § 1983." *Green v. Branson*, 108 F.3d 1296, 1304 (10th Cir. 1997). Under this standard, Plaintiff must prove not only the falsification of the medical records, but also refusal to provide medical treatment.

Plaintiff presents no evidence from which a jury could conclude that Drury refused to provide him medical treatment. Rather, the undisputed facts show Drury monitored Plaintiff's condition and provided wound care throughout Plaintiff's stay at LCDC. Drury also assisted Plaintiff with his showers, medications, catheter, and bowel program. Drury determined on September 22nd that Plaintiff needed transport to a hospital for further care of his bedsores. Accordingly, no reasonable juror could find that Drury acted with deliberate indifference based solely on the falsification of medical records.

\*\*\*

Plaintiff's dissatisfaction over the kind of care Drury provided at LCDC is insufficient to establish a constitutional violation pursuant to 42 U.S.C. § 1983. A

mere difference of opinion regarding medical treatment does not amount to an Eighth Amendment violation for cruel and unusual punishment. *See Ramos*, 639 F.2d at 575. Nor does the negligent failure to provide adequate medical care, even if amounting to medical malpractice, give rise to a constitutional violation. *Self*, 439 F.3d at 1233. *See Sanaah v. Howell*, 384 F. App'x 737, 741 (10th Cir. 2010) (finding Plaintiff's disagreement with the amount of treatment received for a gash on his head was "not sufficient to suggest a constitutional violation, much less deliberate indifference."). Accordingly, Drury is entitled to summary judgment in his favor on Plaintiff's 42 U.S.C. § 1983 claim against him.[9]

### B. Qualified Immunity

Drury also contends he is entitled to qualified immunity from personal liability for the § 1983 deliberate indifference claim alleged against him. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

---

[9] Because the Court concludes Drury committed no constitutional violation against Plaintiff, the Court will not address Drury's separate arguments pertaining to proof of causation.

Accordingly, in a § 1983 action in which the affirmative defense of qualified immunity from liability is at issue, the plaintiff bears the burden to show (1) the defendant's conduct violated his constitutional rights, and (2) those rights were clearly established at the time of the defendant's alleged misconduct. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

As explained above, Plaintiff has failed to demonstrate Drury violated Plaintiff's Eighth Amendment rights by failing to treat Plaintiff's wounds properly or send Plaintiff to the hospital prior to September 22, 2014. Plaintiff's failure to satisfy the first prong of the qualified immunity analysis renders it unnecessary for the Court to consider whether Plaintiff satisfied his burden under the second prong. *See Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

### C.    Punitive Damages

Finally, Drury seeks summary judgment on Plaintiff's claim for punitive damages. Punitive damages are appropriate in an action under § 1983 only if the challenged conduct is "'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Plaintiff offers no evidence to demonstrate Drury exhibited malevolent intent or reckless indifference to

Plaintiff's needs. To the contrary, the evidence described above shows Drury attended to Plaintiff's medical needs, including his bedsores. At most, the evidence points to possible negligence, which is a far cry from the evil intent or callous indifference required to obtain punitive damages. Accordingly, Drury is entitled to summary judgment in his favor on Plaintiff's claim for punitive damages.

## II.     Motion of Board

### A.     Section 1983 Municipal Liability

Plaintiff alleges the Board is liable under 42 U.S.C. § 1983 for failure to provide medical treatment, in violation of his Eighth Amendment rights, and for failure to train and supervise its employees, which led to constitutional violations. The Board argues Plaintiff cannot prevail on this claim, because he cannot establish municipal liability against the Board, which is a necessary element for a § 1983 claim against it. To state a claim under § 1983 against a municipality, a plaintiff must prove: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs,* 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)).

The Court concludes Plaintiff's municipal liability claim fails on the first element of the test—that an employee committed an Eighth Amendment violation. The Court has set forth the standard for evaluating an Eighth Amendment claim for denial of medical treatment above, in Part I.A.1. The Board concedes Plaintiff was suffering from a sufficiently serious medical condition, but asserts Plaintiff cannot establish anyone at LCDC intentionally disregarded a substantial risk of harm to Plaintiff. The Court agrees.

With respect to Plaintiff's medical treatment, Plaintiff argues LCDC staff was indifferent to his medical needs, which resulted in serious bedsores developing on his hips and buttocks. However, for the reasons explained above in Part I, the Court concludes the treatment of Plaintiff's hip and buttocks bedsores did not evince deliberate indifference, and Drury, who was primarily responsible for Plaintiff's wound care, did not commit a constitutional violation against Plaintiff. Further, it is undisputed that other jail staff, including Lowe, assisted Plaintiff with his medical and hygiene needs when Drury was not at the jail. (*See* Dkt. 105, at 4-5, 9 (Board's Undisputed Fact Nos. 13, 16, 18, 24, 52, 53)). As explained above, Plaintiff's difference of opinion with Drury regarding the proper course of treatment is insufficient to state a claim pursuant to 42 U.S.C. § 1983. *See Ramos*, 639 F.2d at 575 ("a mere difference of opinion between the prison's medical staff

and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment."). Moreover, to the extent the evidence supports a finding of medical negligence, deliberate indifference requires more than negligence, even gross negligence. *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 869 (10th Cir. 1997) (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96 (10th Cir. 1990)).

As shown above in Part I, the uncontroverted evidence fails to support a constitutional claim for denial of medical care. The lack of a constitutional violation by a municipal officer negates a finding of liability against the municipality, even if the municipality's policies might have authorized such harm. *Hinton*, 997 F.2d at 782. Because Plaintiff's claim for municipal liability fails on this element, the Court will not examine whether a Board policy caused the alleged constitutional violations.

In addition, Plaintiff has alleged the Board failed to properly train and supervise its jail employees. A municipality may be liable under § 1983 for failure to train "only where the failure to train amounts to deliberate indifference" to inmate rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Section 1983 liability for such a claim requires a failure to train that "reflects a 'deliberate' or 'conscious' choice by a municipality." *Id.* at 389. To prevail on a failure to

supervise claim, a plaintiff must present evidence of an affirmative link between the alleged constitutional violations and the municipality's failure to supervise. *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).

Here, as the Board points out, Plaintiff offers no evidence of any deficiencies in the training of the LCDC staff who cared for Plaintiff, much less evidence that this failure to train caused LCDC staff to be deliberately indifferent to his medical needs. In addition, Plaintiff fails to establish any affirmative link between any failure to supervise and a constitutional violation. Plaintiff simply does not address these claims in his Response to the Board's Motion for Summary Judgment. As a result, summary judgment in favor of the Board is appropriate on Plaintiff's failure to train and failure to supervise claims.

### B.    Americans with Disabilities Act

The Board next argues Plaintiff's claims under the ADA must fail. With respect to the ADA, Plaintiff alleges LCDC staff failed to provide proper medical treatment or proper toilet facilities, would not allow him to shower consistently, did not provide a trapeze bar or a special mattress, and provided unequal access to communication mechanisms. To establish a claim under Title II of the ADA, Plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of a public entity's

services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was because of his disability. *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). *See* 42 U.S.C. § 12132.[10] The Board admits Plaintiff is a qualified individual with a disability, but disputes that Plaintiff was denied benefits, services, and activities at the LCDC because of his disability.

### 1. Failure to Provide Proper Medical Treatment

First, Plaintiff asserts his failure to receive adequate and timely medical care is a violation of the ADA. However, the ADA does not provide a remedy for medical negligence or a means to challenge "purely medical decisions" regarding a course of treatment. *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005). As explained above in Parts I.A and II.A, Plaintiff's claim of inadequate medical treatment amounts to no more than a negligence claim, as it rests on a difference of opinion regarding the proper treatment for his bedsores. In addition, Plaintiff has not alleged he received worse or different medical treatment than non-disabled inmates because of his paraplegia, which also defeats his ADA claim for inadequate medical treatment. *See Schmidt v. Odell*, 64 F. Supp. 2d

---

[10] These protections extend to inmates detained in a county jail. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

1014, 1031 (D. Kan. 1999) (finding that the ADA prohibits jails from "discriminating against a qualified individual with a disability *on account of that disability*.") (emphasis added). Accordingly, Plaintiff presents no actionable claim under the ADA based on inadequate medical treatment.

## 2.     Denial of Access to Proper Toilet Facilities

Second, Plaintiff asserts he was denied access to proper toilet facilities at LCDC. Specifically, Plaintiff complains he received inadequate assistance with his special catheter and bowel program, which he required because of his paraplegia.[11] As a factual matter, Plaintiff admits that Drury assisted Plaintiff with his catheter and bowel program when Drury was on duty. (Dkt. 105, at 4-5 (Board's Undisputed Fact Nos. 16, 18-10)). Plaintiff also admits LCDC staff helped him change his catheter. (Dkt. 105-1 (Plaintiff Deposition), 373:4-14). However, Plaintiff testified he was not assisted with his bowel program on two occasions—on September 2, 2014, and over the weekend of September 20-21, 2014. Plaintiff testified that on September 2nd, he defecated on himself when Drury refused to assist him with his bowel program, and jailers refused to help him clean up. (Dkt. 112-1 (Plaintiff Deposition), 547:20-550:12). Plaintiff also

---

[11] It is undisputed that Plaintiff's cell at LCDC had a toilet and a sink. (Dkt. 105, at 8 (Board's Undisputed Fact No. 43)).

testified that on Saturday, September 20, jailers refused to provide him with bowel assistance, causing him again to defecate on himself.  (*Id.* at 558:10-559:21).  Plaintiff testified he had to remain in his soiled clothes until the following Monday, because jailers refused to provide him with clean clothes.  (*Id.* at 559:22-560:17).

Even if Plaintiff's testimony is true, these matters are not properly remedied by the ADA.  Instead, such violations are properly raised as medical negligence or constitutional claims.  *See Fitzgerald*, 403 F.3d at 1144; *Nasious v. Colorado*, 495 F. App'x 899, 902 (10th Cir. 2012); *Evans v. Rozum*, 2008 WL 5068963, at *10 (W.D. Penn. Nov. 24, 2008) ("[S]howering, defecating, etc., is no more a program or activity than is sleeping.  Denial of [plaintiff's] bowel program supplies . . . does not constitute a violation of Title II of the ADA as a matter of law.").  Even if such a claim were available, Plaintiff fails to demonstrate he was discriminated against or treated differently than non-disabled inmates regarding toilet access *because of his disability*.  As a result, this ADA claim also fails.

### 3.      Denial of Access to Shower Facilities

Third, Plaintiff alleges he was denied access to shower facilities.  The Board argues this claim is deficient, because Plaintiff cannot prove any of the three theories of discrimination under the ADA:  (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable modification.

*Swenson v. Lincoln Cnty. Sch. Dist. No. 2*, 260 F. Supp. 2d 1136, 1144 (D. Wyo. 2003).

Plaintiff testified he received three or four showers during the eighteen days he was incarcerated at LCDC, but he was not allowed to take a shower whenever he requested one. (Dkt. 112-1 (Plaintiff Deposition), 541:22-542:2, 543:12-14). Plaintiff was allowed to bring his shower chair from home and use it while housed in the jail. Plaintiff testified he was wheeled naked once through the booking area to reach the shower area. (Dkt. 112-1 (Plaintiff Deposition), 544:21-547:13). Plaintiff further testified the jail employees laughed as he was wheeled naked through the booking area to the shower room. (Dkt. 112-1 (Plaintiff Deposition), 546:10-17).[12]

The Court concludes Plaintiff's testimony, even if true, does not suffice to demonstrate any of the three theories of ADA discrimination. First, the LCDC did not intentionally discriminate against Plaintiff due to his disability. This standard is akin to the deliberate indifference standard. *See Swenson*, 260 F. Supp. 2d at 1144-45. LCDC staff provided Plaintiff assistance with his showering and, after Plaintiff refused to use the jail-provided shower chair, allowed Plaintiff to use his

---

[12] By contrast, Drury's testified that Plaintiff was always covered with a blanket when he was wheeled to the shower room. (Dkt. 105-3 (Drury Deposition), 109:4-20).

own shower chair from home.  (Dkt. 105, at 5 (Board's Undisputed Fact Nos. 22-23)).  Jail staff wheeled Plaintiff to the shower room at least three times during his eighteen-day stay at LCDC.  It is undisputed that LCDC inmates in holding cells, such as Plaintiff, were asked daily whether they wanted to take a shower.  (Dkt. 105, at 5 (Board's Undisputed Fact No. 21)).[13]  Although there remains a dispute as to whether jail staff wheeled Plaintiff naked through the booking area once on the way to the shower room, it is undisputed that he was covered with a blanket on subsequent trips to the shower.  These facts fail to establish a "sufficiently culpable state of mind" amounting to deliberate indifference to a substantial risk of violating Plaintiff's rights under the ADA.  *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).  Plaintiff's dissatisfaction with the frequency of showers, and his one-time embarrassment from being wheeled naked through the booking area, which was remedied on subsequent trips to the shower room, do not evidence deliberate indifference.

Second, Plaintiff cannot establish discriminatory impact.  Plaintiff was assisted with his showers, and he offers no evidence that other non-disabled inmates were permitted to shower more frequently.  Third, Plaintiff cannot

---

[13] Plaintiff denies this Undisputed Fact in his Response, but his supporting testimony states only that he was unable to shower whenever he requested it.  (Dkt. 112-1 (Plaintiff Deposition), 541:18-543:7).

establish an ADA violation under a reasonable modification theory. Plaintiff was able to shower effectively by use of the reasonable modification of a shower chair. An existing building may be considered ADA-compliant, without making structural changes, "where other methods are effective in achieving compliance." *Tyler v. City of Manhattan*, 857 F. Supp. 800, 813 (D. Kan. 1994) (quoting 28 C.F.R. § 35.150(b)(1)) (quotation marks omitted). Here, the method of using a shower chair was effective in achieving compliance. As a result, Plaintiff cannot establish a violation of the ADA based on access to showering facilities.

### 4. Denial of Access to Trapeze Bar and Special Mattress

In the Complaint, Plaintiff alleges that he was not provided a trapeze bar to lift himself out of bed, which violated the ADA. The Board argues this claim fails, because Plaintiff was able to pull himself out of bed using the top bunk and a slide board to transfer to his wheelchair. (Dkt. 105, at 8 (Board's Undisputed Fact No. 44)). The Board also argues that, to the extent Plaintiff asserts an ADA violation based on denial of a special mattress for his bed at LCDC, this claim must fail. Plaintiff was allowed to bring his gel mattress topper from home, and Plaintiff never requested further accommodation. (*See* Dkt. 105, at 3, 8 (Board's Undisputed Material Fact Nos. 4, 48)). Plaintiff does not respond to these

arguments. The Court considers these matters waived and grants summary judgment in the Board's favor on these issues.

### 5. Denial of Access to Communication Mechanisms

Finally, in his Response brief, Plaintiff asserts he was "not provided the same access to mechanisms for communicating with LCDC staff, as were non-disabled inmates." (Dkt. 112, at 25). Plaintiff does not expand on this argument or cite to any evidence in support. Plaintiff's unsupported allegation is insufficient to raise a genuine issue of material fact. The Court finds the Board is entitled to summary judgment with respect to this issue.

### C. Rehabilitation Act

Lastly, the Board seeks summary judgment on Plaintiff's claim under the Rehabilitation Act. The Rehabilitation Act prohibits discrimination against disabled individuals by entities or programs that receive federal financial assistance. 29 U.S.C. § 794. To prove a Rehabilitation Act claim, a plaintiff must demonstrate four elements: (1) the plaintiff is disabled under the Act; (2) he is "otherwise qualified" to participate in the program; (3) the program receives federal financial assistance; and (4) the program has discriminated against the plaintiff. *See McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004). The Board argues Plaintiff cannot prove this claim, because LCDC did not receive

36

federal funding during Plaintiff's 2014 incarceration. (*See* Dkt. 105, at 7 (Board's Undisputed Fact No. 37)). In his Response brief, Plaintiff does not dispute the Board's statement of fact in this regard, and he does not respond to the Board's argument or otherwise address his Rehabilitation Act claim. Accordingly, the Board is entitled to summary judgment on the Rehabilitation Act claim.

## CONCLUSION

For the reasons detailed above, Defendant Ed Drury's Motion for Summary Judgment (Dkt. 107) is **GRANTED**. Defendant Leflore County Detention Center Public Trust Board's Motion for Summary Judgment (Dkt. 105) is **GRANTED**.

**IT IS SO ORDERED** this 2nd day of May, 2018.

James H. Payne
United States District Judge
Eastern District of Oklahoma